489 So.2d 150 (1986)
Jean TUMULTY, Appellant,
v.
STATE of Florida, Appellee.
No. 84-2505.
District Court of Appeal of Florida, Fourth District.
May 28, 1986.
Rehearing and Certification of Question Denied June 26, 1986.
*151 Richard L. Jorandby, Public Defender, and Jeffrey Anderson, Asst. Public Defender, West Palm Beach, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Carolyn V. McCann, Asst. Atty. Gen., West Palm Beach, for appellee.
DOWNEY, Judge.
Appellant, Jean Tumulty, was indicted by a grand jury for the first degree murder of Frank Marrs. She was found guilty by a trial jury of first degree murder and sentenced to life imprisonment with a mandatory minimum of twenty-five years.
The evidence most favorable to the jury verdict indicates that Tumulty was a drug broker who acted as a middleman between drug smugglers and buyers of the contraband. Between August and November, 1980, Tumulty did business with her close friend and business associate, Judy Haas, in finding buyers for drugs, which Haas smuggled into the United States. Haas owned a Cessna Queenaire airplane, which transported the drugs from points outside the United States to locations in the United States. The cast of characters involved herein, besides Tumulty and Haas, are Frank Marrs, the victim of this crime, and George Kersting, who piloted Haas' plane on various smuggling operations. Gary Childers also worked for Haas. John Parella worked for Tumulty and assisted in the distribution of the drugs when they arrived stateside. Haas had successfully smuggled three loads of marijuana into Sylvester, Georgia, and Tumulty participated in the distribution thereof to various buyers. In a fourth operation, carried out by Haas, Frank Marrs was the pilot. Tumulty was not directly involved. When Haas was unable to sell the contraband and, thus had not paid Marrs, Marrs decided to keep possession of the Cessna. That fatal decision was apparently his undoing. Without the plane Hass's operation, as well as Tumulty's, was effectually shut down.
On the evening of December 29, 1980, Tumulty, Haas, Childers and Parella met at Tumulty's house to discuss ways to recover the Cessna from Marrs. The options discussed were to get a different pilot to fly the plane away from the location where Marrs had it; have Parella "persuade" Marrs to return the plane; or, as Childers heard Tumulty say, "kill the greedy bastard." The next day, during a further meeting on the same subject, Parella heard Tumulty offer Parella's services to kill Marrs. Later that day Haas and Childers met with Marrs without success. As a result, Haas was upset and told Childers to call Tumulty to get "our friend" ready. After Childers and Parella were unable to get Marrs to release the plane, Tumulty told Childers to tell Parella to "take care of Frank." Childers, Parella and Marrs then went to look at an airstrip and, during their trip, Parella killed Marrs. Upon their return they advised Tumulty that everything had been taken care of. Tumulty is quoted as asking Parella if he was sure Marrs was dead or was he going to come crawling out of the woods. This apparently had reference to Parella's previous failure to kill an intended victim. When Marrs's body was later found, Tumulty told Parella if he had just called her, she could have told him where to dump the body so it would never be found.
Tumulty took the stand and, of course, denied all of the inculpatory statements charged to her.
Six points are presented in this appeal. The first involves a denial of Tumulty's motion to dismiss the indictment because the grand jury was improperly empaneled according to the dictates of section 90.501, Florida Statutes (1983). The last point contends error was committed in the denial of Tumulty's motion for mistrial, based upon the cumulative effect of the many errors allegedly committed. We have carefully *152 considered both of said points and find no reversible error demonstrated therein.
In another point, Tumulty contends error was committed by the court in failing to require the state to furnish the present address of Parella, Childers and Kersting, pursuant to Florida Rule of Criminal Procedure 3.220(a)(1)(i). Tumulty knew the identities of the mentioned witnesses, their prior addresses and other prior information. The problem issue presented is that Parella and Kersting were in the federal witness protection program and Childers, though not actually in the program, was being funded so that he might move from place to place to prevent identification. The evidence is that all of them were in fear of reprisals because they had testified against Haas and Tumulty during their prior criminal conviction in Georgia. Tumulty contended the addresses were needed to check out some allegedly inconsistent statements. She argued that the foregoing rule required that she be furnished the addresses; that the personal safety exception to the rule was to be narrowly applied, relying on State v. Hassberger, 350 So.2d 1 (Fla. 1977). We find that the cases relied on by Tumulty, Pena v. State, 432 So.2d 715 (Fla. 3d DCA 1983) and Garcia v. State, 379 So.2d 441 (Fla. 3d DCA 1980), are inapposite because of our peculiar facts, i.e., appellant's familiarity with all of the prior facts and the known identity of the witnesses. In any event, the court considered the arguments of counsel and concluded that Tumulty had failed to demonstrate the requisite need to support such an order. We find no error involved in that decision under the facts of this case.
Next, Tumulty complains of the trial court's ruling admitting hearsay statements of Haas without independent evidence of a conspiracy between Haas and Tumulty. Of course, resolution of these evidentiary questions is for the court in its sound discretion and will not be disturbed absent an abuse thereof. Booker v. State, 397 So.2d 910 (Fla.), cert. denied, 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981); Ashley v. State, 370 So.2d 1191 (Fla. 3d DCA 1979). The foundation for the admission of said hearsay was the testimony of Parella and Childers, who were present, heard and participated in various of the discussions between the co-conspirators. It is clear that the record in this case will support a jury's finding of a conspiracy. A resume of that evidence from appellee's brief is:
Testimony established that Appellant and Judy were close friends as well as business associates who worked together in a sophisticated drug smuggling operation. Judy Haas smuggled drugs into the country and Appellant acted as her broker. Both women had an interest in seeing that the drugs were purchased. Appellant herself testified that she became involved with the fourth load of marijuana when she flew to Boulder, Colorado to "look at it with the hopes that someone would want to purchase it. [sic] There were no buyers for this load however, and Frank Marrs, the pilot who flew it in, was demanding to be paid $125,000 for his services. Once it became evident that Frank Marrs would not return Haas' [sic] plane unless paid, Haas and Appellant conspired to have Marrs murdered. Appellant herself testified that on December 29, 1980, Haas mentioned that she wanted to kill Marrs. Gary Childers testified that Appellant suggested to Haas that they just "kill the greedy bastard" and that with the money that was owed Marrs, they could buy two Queenair airplanes. John Parella testified that Appellant told Haas that if it came down to killing Marrs, Parella would do it. Appellant told Parella to get a gun before seeing Marrs on December 30, 1980 and told Childers later that same day to tell Parella to "take care" of Marrs. Both Childers and Parella testified that Appellant in the presence of Haas asked if "it" was done after Marrs was murdered. Childers further testified that as he and Haas were leaving Appellant's home on the day of the murder, Appellant hugged Haas and told her *153 not to worry and that she would take care of Parella for what he did.
Appellant's last two points pertain to the state's use of collateral crime evidence over objection. In support of that suggestion of error Tumulty argues that this is a homicide case and the state turned it into a drug abuse case; that the only drug haul that was relevant to this case was the fourth one, as to which Tumulty says she had no participation. She contends that the evidence relative to the first three drug smuggling transactions was collateral crime evidence, which was not relevant and thus inadmissible under section 90.404(2)(a), Florida Statutes (1983). The state's position throughout was that the above cited section of the Evidence Code did not control the admissibility of the evidence in question. On the contrary, the evidence of the first three smuggling trips and the sale and distribution of the drugs was admissible under section 90.402 simply as relevant evidence. It was relevant because it was "inextricably intertwined" in the scenario of the fourth trip to show the context of the crime. It was "inseparable crime" evidence that explains or throws light upon the crime being prosecuted. In order to present an orderly, intelligible case the state had to show the relationship between Haas and Tumulty, close personal friends and business associates, supplier and middleman. It was necessary to show the relationship between the various pilots, Marrs, Childers and Kersting, and Parella and his participation. The motive for the killing was directly related to the "conversion" of Haas's airplane by Marrs and the urgent need for both participants to get it back in service.
Professor Ehrhardt discusses "inseparable crime" evidence and the characteristics distinguishing it from "Williams Rule"[1] evidence in his work on Florida Evidence (2d ed. 1984):
[T]he Florida opinions have not contained a close analysis of the reasons that inseparable crime evidence is admissible. Professor Wigmore suggests that this evidence is not admitted either because it shows the commission of other crimes or because it bears on character, but rather because it is a relevant and inseparable part of the act which is in issue. This evidence is admitted for the same reason as other evidence which is a part of the so-called "res gestae"; it is necessary to admit the evidence to adequately describe the deed. In addition to Wigmore's logical argument, it seems that both the language of Section 90.404(2)(a) and of Williams indicates that the rule applies to evidence of discrete acts other than the actions of the defendant committing the instant crime charged. Under this view, inseparable crime evidence is admissible under Section 90.402 because it is relevant rather than being admitted under 90.402(2)(a). Therefore, there is no need to comply with the ten-day notice provision. The Wigmore view has been adopted by the United States Court of Appeals for the Fifth and Eleventh Circuits. [Footnotes omitted.]
Ehrhardt, § 404.16 at 138. See also Smith v. State, 365 So.2d 704 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979); Ashley v. State, 265 So.2d 685 (Fla. 1972).
Looking at the evidence in its totality, we are persuaded that the evidence of the other smuggling trips was admissible and that it was not made a feature of the case. The percentage of the transcript devoted to the collateral crime evidence is not inordinately great and we have approved far greater percentages than are involved here. See Townsend v. State, 420 So.2d 615 (Fla. 4th DCA 1982), pet. for rev. denied, 430 So.2d 452 (Fla. 1983).
Accordingly, we find no reversible error demonstrated and affirm the judgment appealed from.
AFFIRMED.
HERSEY, C.J., and WALDEN, J., concur.
NOTES
[1] Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).