511 So.2d 583 (1987)
Eduardo HUHN, Appellant,
v.
STATE of Florida, Appellee.
No. 85-1471.
District Court of Appeal of Florida, Fourth District.
April 8, 1987.
On Motion for Rehearing September 16, 1987.
*584 Marc Cooper and Sharon L. Wolfe of Cooper, Wolfe, & Bolotin, P.A., Miami, and Donald L. Ferguson, Coconut Grove, for appellant.
Robert A. Butterworth, Jr., Atty. Gen., Tallahassee, and Sarah B. Mayer, and Diane Leeds, Asst. Attys. Gen., West Palm Beach, for appellee.
GLICKSTEIN, Judge.
This is an appeal from a conviction for armed kidnapping and aggravated assault with a firearm. We reverse and remand for new trial because the errors by the prosecutor and the trial court were not harmless. In the opinion we shall refer to appellant's codefendants in Biscardi v. State, 511 So.2d 575 (Fla. 4th DCA 1987), a decision issued today, and in Mones v. State, a PCA reported in 485 So.2d 9 (Fla. 4th DCA 1986).
The record reflects a bizarre scenario. A 911 call was received by the Broward County Sheriff's Department Communications Division at approximately 3:15 a.m. on February 5, 1984. The caller reported that he was going to be killed; that he was handcuffed to a table; that three men were involved, two of whom were not there at the time, and that the men were armed. Miramar police were dispatched to the location. The door was answered by codefendant Biscardi, who stated everything was fine, and that the person inside was drunk. Yells for help were heard from inside. Inside the house the police found the victim handcuffed to a table, screaming for help. Biscardi then told the police that he did not know what to do now, as he was only doing this as a favor. The victim and the said codefendant were taken to the Miramar police station.
According to state witness Sergeant Mantesta, of the Miramar police, Biscardi told the police at the station that he was "a dead man" for failing to tape the victim's mouth, and that he was in trouble with the "big guys"; the "guys" were to return at *585 11 a.m. to kill the victim, and that they were capable of doing anything. A later search of the codefendant's house produced a receipt from the Avis office at the Orlando airport for a blue four-door Chevy sedan.
Nick Fiola, the victim, testified that he and Biscardi had driven cocaine to California and the payment money back to Miami  all for Huhn. Fiola admitted to making six such "drug" trips. Fiola also decided to "rip off" the drug payment money on the way back to Miami. To this end, he plotted in 1983 with "Carl" and "Paul" whom he had met at Jimmy Varone's service station. However, at that time the plan was abandoned. Before his last drug trip, Fiola, who actually saw the cocaine he and Biscardi were to transport (because Fiola had to pack it in the car) again plotted with Carl to rip off the drug money. This plan was successful. The car with the drug money was stolen at the Turkey Lake Service Plaza, where Fiola and Biscardi stopped on their return from California. Biscardi was taken with the car. Fiola waited a while at the rest area, and he was called by the highway patrol, who located Biscardi at turnpike exit 75. The highway patrol looked for the stolen car but did not find it. The highway patrol must have taken Fiola to that exit, as Fiola testified he and Biscardi took a cab from there to the airport to rent a car. Then they drove the rented car to Fort Lauderdale airport so that Fiola could pick up his car. Biscardi instructed Fiola to drive past Biscardi's home, and if defendant Huhn's car was there, Fiola was to stop and come in. Huhn's BMW was there, so Fiola stopped and went in. Huhn was there. He threatened to kill Fiola and Biscardi with a gun unless they found his money, then sent Biscardi and the victim back to Orlando to try to find the car that had been stolen. The two looked at different hotels in the area, but could not find the car, so they went home, afraid Huhn was going to kill them.
Biscardi refused to allow Fiola to go home. When Fiola attempted to leave, Biscardi produced a small pistol and ordered Fiola into Biscardi's house to await Huhn. Fiola was eventually handcuffed to the table, repeatedly threatened, and held for two days.
Huhn got the handcuffs from one of the other codefendants, put them on Fiola, then placed a gun to Fiola's head and said he was going to blow Fiola's brains out because Fiola had set up the "trick." Biscardi punched the victim in the face. Codefendant Mones threatened to chop the victim up and feed him to the fishes. Huhn handcuffed Fiola's right hand to the table and cuffed Fiola's feet together. Fiola's face was bleeding. Huhn threatened to kill Fiola and his family; and he also threatened to cut Fiola's son's arms and legs off. Fiola was scared by these threats and by Huhn's gun. Huhn wanted his money back, saying there was approximately $485,000 in the car.
Huhn and Mones left, with Fiola alone with Biscardi, who repeatedly exhorted Fiola to tell the truth, saying Fiola would not be harmed if Huhn got his money back. Biscardi even offered to pay Fiola $50,000 to tell him (Biscardi) who took the money. Finally, tired, exhausted and scared, Fiola told Biscardi that he had set up the theft whereupon Biscardi made a phone call, and in a half hour or an hour, codefendant Mones returned and questioned Fiola as to where the "guys" who took the car and the money lived. Fiola told Mones where Carl's shop was; and Mones left.
The next morning, Saturday, Huhn returned with Mones and another man. Huhn, who was armed, began interrogating Fiola, and threatened to kill Fiola, his son and his ex-wife. Mones instructed Biscardi to go to the kitchen and get a knife as he (Mones) was going to cut up the victim and throw him to the fish. The defendant grabbed one of Fiola's feet and took one handcuff off, and Biscardi gave a knife to Mones, who threatened to cut Fiola's leg off.
Fiola was moaning, so Huhn put a handkerchief in Fiola's mouth so he could not scream. Finally, Huhn dropped Fiola's foot, replaced the handcuff and again *586 threatened to kill Fiola if he did not get in touch with somebody.
Fiola gave Huhn the phone number of Jimmy Varone, who was Fiola's only means of contacting Carl. They dialed the number and gave the phone to Fiola. Huhn held a gun to Fiola's head and threatened to kill him if he made a wrong move. Huhn had a pad or paper in his hand with instructions on what Fiola was to say to Varone. Fiola asked Varone to find Carl and to have Carl meet him, Fiola, at the shop the next morning. While Fiola was talking with Varone, Huhn grabbed the phone and threatened Varone, his family and his gas station. Fiola's conversation with Varone was being listened to by someone on the extension phone in the kitchen.
The "guys"  Huhn, Mones and the other man  left Biscardi's house about 11 p.m. Saturday evening; the last thing they told him was that he would be dead the next morning.
Later, when Fiola awoke, he found Biscardi asleep and snoring; so he got off the couch and managed to pull the coffee table along until he could reach the phone, from which he made the 911 call.
Fiola later identified the photograph of Huhn that Fiola had identified for the police.
A tape recording of Fiola's 911 call was played. On cross-examination Fiola admitted that for about six months he maintained that he did not know who the other people involved in his kidnapping (besides Biscardi) were. He had also denied knowing who the others were when he appeared at Biscardi's bond hearing.
Carl Lord of the state attorney's office testified that he took a handwriting exemplar from Huhn. Despite Mr. Lord's instructions to defendant Huhn to write in cursive or script, or his normal handwriting, the defendant printed. Huhn wrote very slowly and deliberately. Lord had him write out some of the numbers and phrases which were found on a document or piece of paper in Biscardi's house. Huhn asserted that printing was the only way he wrote.
Janine McKenzie, a latent print examiner for the Broward County Sheriff's Department, testified that she had identified Huhn's palm print from a latent print lifted off the coffee table in Biscardi's house, another palm print of Huhn from the dining room table in Biscardi's house, and another palm print of Huhn from a piece of paper found in Biscardi's house. Ms. McKenzie's identification was verified by Detective Ellery Richtarcik and by Sandra Yorkman, two other latent print examiners from the Broward County Sheriff's department.
Jimmy Varone corroborated Fiola's testimony regarding his plan to rip off the money, first in 1982 and then at the time the car was actually taken. Varone testified he received a call for help from Fiola, saying they were going to cut his legs off if Carl didn't give the money back. During this call someone else got on the phone and threatened Mr. Varone and his wife, and to blow up his house. The voice said there was a half-a-million dollars involved, and if Varone got the money for the caller, he (Varone) would get $200,000 for himself.
John Coffey of the Florida Department of Law Enforcement (FDLE), testified that he arrested Huhn in July 1984. Coffey identified a gun, and the receipt for its purchase, which he had removed from the glove compartment of the car in which Huhn was driving when he was arrested. Huhn objected to the testimony about the gun and moved for a mistrial, claiming it was prejudicial and unconnected with the alleged crime.
Ronald Dick, formerly a document examiner for Florida Department of Law Enforcement, testified that he was asked to compare the specimens taken of Huhn's handwriting, i.e., on checks, Alcohol, Tobacco and Firearm (AFT) forms, and his American Express credit card application, as well as with the writing on two envelopes found in Biscardi's home. Mr. Dick's opinion was that the same person who wrote the checks, the three AFT forms, and the American Express Application made most of the writing on the two envelopes, taken from Biscardi's house. He testified that he *587 could not form an opinion as to whether the handwriting in the defendant's handwriting exemplars given to the police, was made by the same person whose handwriting was on the envelopes. Mr. Dick stated that the block printing style of the defendant's handwriting exemplars was indicative of an intentional disguise of handwriting.
Huhn testified in his own defense. He stated he called Biscardi on the morning of Friday, February 3, 1984. According to Huhn, Biscardi said he needed help, and asked Huhn to come over. Huhn testified he went to Biscardi's home at 8:30 that evening. Fiola and Biscardi were there. Biscardi told the defendant that they were returning to Florida in a car loaded with money and the car was stolen. Biscardi and Fiola appeared frightened. Huhn testified that Biscardi didn't tell him how he could help them, and eventually Huhn left.
Huhn further testified that Biscardi called him the next day, again imploring him to come to Biscardi's house, and to help. Although Huhn did not know what he could do, he went over to help, arriving at Biscardi's about 3:30 p.m. on Saturday, February 4. Fiola and Biscardi were there alone. Fiola began to tell Huhn how Fiola had set up the fake robbery, and that now he was scared. Huhn told Fiola that if he were going to help, he needed to have all the facts so that they could identify the problem; put down the facts and then put everything together. Thus, Huhn testified, he wrote down the facts. Huhn then identified the two envelopes, found at Biscardi's house, and testified as to what he had written down and why.
Huhn testified that he wrote, "get a hold of Carl" because it was the most obvious thing to do. He wrote "they know everything" because Carl or whoever was involved in the rip-off knew everything and perhaps information could be obtained from them; he wrote "please help and everything will be okay. If not we're dead" ("we're dead" was scratched out) because the defendant thought that if Biscardi and Fiola could communicate with Carl and others involved they might be able to help themselves. He said "I hate to think about it," was just a thought. His writing, "we will get something out of it," was merely his suggestion.
On the second envelope, Huhn wrote the data (address, phone number, etc.) for Jimmy Varone, Paul and Carl. Huhn said the detective asked him to block print the writing exemplars.
Huhn denied having a gun with him in Biscardi's house, denied Fiola was beaten up, or handcuffed or restrained in any way, and denied threatening Jimmy Varone. He admitted owning guns, saying he carries receipts of his shoe store in the car. The gun is licensed.
A records custodian for Southern Bell testified to records of a number of calls from and to places at or near the Florida Turnpike, in the Orlando to Port St. Lucie area, involving the telephones of Eduardo and Nina Huhn, Mrs. Biscardi and Fiola's former wife, at times pertinent to the hijacking of the car, and shortly thereafter.
Huhn and other defendants raised several objections to Fiola's testimony concerning the previous drug transactions Fiola said he had been involved in. The reasons for the objections were that the testimony was hearsay and irrelevant, the prejudice outweighed the probative value, and the state's failure to give notice it intended to rely on evidence of other crimes. Huhn and other defendants also moved for mistrials. Among the things Fiola said was that Biscardi told him Huhn was in charge of all the drug transactions, while admitting Fiola himself had never talked with Huhn about drugs or about transporting them. The court allowed Huhn's counsel a continuing objection respecting anything Fiola testified to that purported to be what Biscardi told him.
During closing argument, Huhn unsuccessfully objected to the prosecutor's stated interpretation that the crossed-out sentence in Huhn's writing on an envelope, which Huhn passed over when explaining the meaning of the notes, signified his intention to wipe out Fiola and Jimmy's Gulf [Varone]. Huhn's counsel joined Biscardi's counsel in moving for a mistrial when the prosecutor kept stressing the intention of *588 the defendants to kill Fiola. The motions were denied.
Defendant/appellant Huhn points out several alleged errors during instruction of the jury. The trial court said, while instructing the jury, that he had a feeling the jury had already made up its mind about the verdict and pretty much already knew the law; nevertheless he was going to go over the legal aspects until he thought he had conveyed the ideas to the jury. Also, at the beginning of giving the instructions, it had said the jury could not take the instructions back (to the jury room). Then it said there was no provision for it either to reinstruct the jury, have any testimony read back, or recall any witnesses. Early in the trial it had refused to tell the jury they could take notes because there was to be a hiatus in the trial.
At the close of the instructions it said no other laws apply to the case, and made reference to earlier talk about the laws of entrapment and self defense, which it said had nothing to do with the case. The defendants objected to the alleged errors in the instructions, and requested curative instructions, but the objections were overruled.
At Huhn's sentencing, the trial court heard Huhn's evidence in mitigation, but received no evidence from the state to support departure from the guidelines sentence. It said it would reduce to writing its reasons for departure but did not enter such an order until this court directed it to do so. The reasons (found in the supplementary record) were (1) the psychological trauma and fear of imminent death inflicted on the victim, (2) the seriousness of the offense of which Huhn was convicted, and the circumstances of the offense  that Huhn headed a large scale, violent drug ring, and (3) the guidelines sentence is not sufficient for retribution, deterrence or rehabilitation.
The issues, restated, and our holding upon each are as follows:
I. Whether the trial court erred in allowing the state to introduce into evidence (a) appellant's gun and (b) gun purchase records, when there was no connection made between the gun, taken which was from appellant's car when he was arrested five months after the offense, and the subject offense. We conclude it did err as to the former, and have comment upon the latter.
II. Whether the trial court erred in allowing in evidence of other crimes, (a) not relevant to the instant case and linked to the defendant only by inadmissible hearsay, and (b) when the state gave no notice it would introduce such evidence. We conclude it did, in part, but only as to hearsay, not notice.
III. Whether the trial court erred in its remarks, while instructing the jury, implying it was all right for the jury to have already made up their minds about the verdict, and suggesting they could not request reinstruction or review of evidence. We conclude it did not err, as to the former, but did err, as to the latter.
IV. Whether the trial court erred when it denied defendant's motion for mistrial because of the prosecutor's improper injection of personal opinion and references to matters not in evidence. We conclude it did not err but have comment upon it.
V. Whether the trial court erred in sentencing appellant without a scoresheet and in departing from the guidelines sentence for reasons that are not clear and convincing. We conclude it did.

I

APPELLANT'S GUN AND GUN PURCHASE RECORDS
A trial court has wide discretion concerning the admissibility of evidence, and a ruling on admissibility will not be disturbed unless there has been an abuse of discretion. Jent v. State, 408 So.2d 1024, 1029 (Fla. 1981). The test for admissibility of evidence is relevance, not necessity. In general, any facts relevant to prove a fact in issue is admissible unless admission is precluded by specific rule. E.g., Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959). According to section 90.401, Florida *589 Statutes (1985), relevant evidence is evidence that tends to prove or disprove a material fact. Section 90.402 states all relevant evidence is admissible except as provided by law. Section 90.403 states that relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury or needless presentation of cumulative evidence.
Appellant contends the evidence concerning the gun and the AFT records of his purchase of this and other guns was inadmissible. He says that because the particular gun was not linked to the offenses charged, it served the purpose only of conveying to the jury that Huhn's having guns tended to support the testimony that he had a gun when engaged in the charged crimes. We agree.
The following quote from the record bears upon the question of admissibility of the pistol found in Huhn's glove box:
DEFENSE COUNSEL: Judge, I'd like for the record to move for a mistrial based on the fact that there's been no testimony that this pistol was used by Eduardo Huhn at the time of the alleged kidnapping.
THE COURT: What says the State?
PROSECUTOR: Judge, I am not saying it is connected up but it is certainly circumstantial evidence that, first of all, that weapons have been identified as having been used in this instance and he is in possession of weapons. Furthermore 
The state suggests unenthusiastically that the evidence is relevant because it casts light on the character of the crime charged; for example, shows motive, intent, absence of mistake, common scheme or plan, identity, or a system or general pattern of criminality which is discussed, among other places, in Ruffin v. State, 397 So.2d 277, 280 (Fla. 1981). Not the least problem with this reasoning is the fact the subject principle applies to evidence of a separate crime or crimes not directly involved in the trial. Here, there is nothing unlawful about Huhn's ownership of the gun, and nothing to connect the particular gun to the crimes for which Huhn was on trial. We conclude that the gun was not relevant to the case.
As to the ATF documents, on retrial they could be admitted for the purpose of handwriting comparison, only if the trial court is convinced that the other available handwriting exemplars  bank deposit slips, checks and bank account records, are not ample  because of the trial court's conclusion, on remand, of some artifice on the defendant's part.

II

ADMISSION OF TESTIMONY CONCERNING OTHER CRIMES
It is true that drug trafficking and the rip off of drug money precipitated the offenses for which Huhn was being tried in this case. Thus, Huhn does not question the admission of evidence regarding Fiola and Biscardi's last trip to deliver drugs to California, driving back with the sale proceeds and being hijacked at a Florida Turnpike rest area. He argues, however, that evidence of several earlier drug trafficking events in which the state sought to implicate him was irrelevant to a motive for the present alleged kidnapping and assault. Moreover, the only link between those criminal exploits and Huhn was the hearsay, presented by Fiola, that Biscardi had told him Huhn was the kingpin in those transactions. That hearsay, he urges, was clearly inadmissible. Huhn points out that when questioned, Fiola affirmatively stated he had never had any narcotics involvement with Huhn nor talked with Huhn about taking cocaine to San Francisco or about narcotics in general.
The state points out that during instruction of the jury the court told them not to consider evidence of unrelated crimes as proof of the charged crimes. Appellant responds that that might be curative when the evidence of the other crimes was admissible, but does not overcome the prejudice when there was no admissible proof linking Huhn to those earlier crimes.
*590 In Tumulty v. State, 489 So.2d 150 (Fla. 4th DCA 1986), the appellant was being tried for the murder of a pilot who transported drugs in an airplane belonging to the appellant's friend and business associate. The appellant attacked the admission of evidence relating to three drug smuggling transactions prior to the one that lead to the murder that resulted from the pilot holding the airplane and demanding $125,000 for his services. The appellant claimed evidence of the earlier smuggling operations was irrelevant collateral crime information that was inadmissible under section 90.404(2)(a), Florida Statutes. This court disagreed. It stated the evidence of the earlier transactions was admissible under section 90.402 simply as relevant evidence. It was inextricably intertwined with the most recent smuggling trip to show the context of the murder, and inseparable crime because it shed light on the crime being prosecuted. It helped illuminate the relationship among the various persons connected with the murder. This court quoted Professor Ehrhardt's Florida Evidence § 404.16 (2d ed. 1984) in support of this holding. Ehrhardt indicates the Fifth and Eleventh Circuits have adopted Wigmore's view that the reason for admitting such evidence is similar to that for admitting so-called "res gestae" evidence  it is necessary in order adequately to describe the deed. Ehrhardt says it is thus relevant and admissible under section 90.402, and does not fall under section 90.404(2)(a).
Appellant appears to concede that Tumulty would support admission of the collateral crime evidence here being attacked, except for the fact the evidence as to Huhn's involvement was pure hearsay, as Fiola  not a coconspirator as to the crimes for which Huhn was on trial, but the victim  merely related what Biscardi had told him.
We perceive a difference, in part, between Tumulty and the present case. Whereas the murdered pilot's role in the previous smuggling trips and his relationship with the several others in the drug smuggling ring in Tumulty appeared to this court intertwined with the pilot's murder, all of Fiola's prior trips to deliver cocaine to California and bring back the money have no bearing on the present crime except the last trip when the ripoff allegedly occurred.
Tumulty apart, the state argues that a hearsay statement of a coconspirator made during the course and in furtherance of the conspiracy is excepted from the hearsay rule by section 90.803(18)(e) and thus admissible as evidence. We observe, however, that such a statement is admissible only when there is independent evidence that both the declarant and the objecting party were members of the conspiracy. See Saavedra v. State, 421 So.2d 725, 727 (Fla. 4th DCA 1982); Tresvant v. State, 396 So.2d 733, 736-37 (Fla. 3d DCA 1981); and Honchell v. State, 257 So.2d 889, 890 (Fla. 1971).
In the instant case, independent evidence that Huhn participated in a conspiracy for the commission of the earlier drug trafficking offenses was not provided. Hence, Biscardi's statement to Fiola that Huhn was implicated in those offenses was not admissible. Accordingly, there was an inadequate predicate for introducing evidence of Fiola and Biscardi's earlier drug-trafficking trips to California, for use against Huhn.

III.

TRIAL COURT'S COMMENTS

A.
Appellant characterizes the trial court's comment, during the giving of instructions, respecting its belief the jury had already decided what the verdict should be, as a statement that the jury should already have done so. We think appellant's reading is incorrect, but the comment nevertheless merits careful scrutiny for its possible effect on the jury. See Villageliu v. State, 347 So.2d 445, 447 (Fla. 3d DCA 1977). In Parise v. State, 320 So.2d 444 (Fla. 3d DCA 1975), the rule is stated that the trial court should avoid making directly to or within the hearing of the jury any remark susceptible of interpretation as the judge's view of the case or of the weight, character or credibility of *591 any of the evidence. On retrial, the comment should not be made.

B.
We view appellant's contention that the fairness of the trial was impaired because the trial court indicated it could not repeat instructions or have testimony reread as more serious.
The remarks to which we refer are the following:
Also, there is really no provision for me to either reinstruct you after I instruct you or certainly to have any testimony read back or certainly to call any witnesses back. You are going to have to remember the testimony and the instructions on the law as best you can and probably the next time we hear from you will be when that buzzer in there rings and we all jump about a foot up in the air and then, you have a verdict.
The fact the trial court had, early in the two week trial involving three defendants refused to tell the jury they could take notes because the trial would be interrupted for a few days tends to aggravate the impact of the above pronouncement. We do not say the the refusal was itself erroneous.
Florida Rule of Criminal Procedure 3.410 permits but does not require the trial court, on the juror's request, to "give them such additional instructions or ... order such testimony read to them" as the jurors have requested. Counsel for both sides must have notice that this is going to be done. Id. It clearly does not prohibit the trial court from reinstruction nor having testimony reread; yet we have to assume, as reasonable people, that some, or all, of the jury so understood the trial court's remarks to mean such prohibition existed.
In Cedars of Lebanon Hospital v. Silva, 476 So.2d 696 (Fla. 3d DCA 1985), it was held that the trial court did not abuse its discretion, but properly granted the plaintiff's motion for mistrial, when its attention was called to the harmful effect on the plaintiff's interest of its statements to the jury that it could not become the jury's pen pal and did not wish to answer questions from the jury lest the court influence their deliberations. Furthermore, perhaps jurors would have asked questions pertaining to the instructions or sought to have certain testimony read to them if they had thought it possible. In our view, the error was harmful.

IV.

PROSECUTOR'S OPINION AND COMMENT UPON MATTERS NOT IN EVIDENCE
Appellant correctly observes that the heart of the state's case was Fiola's testimony, together with the notes found in Biscardi's house that Huhn admitted writing. Appellant contends that when the prosecutor attempted to put a so-called psychological interpretation on the part of these notes that was crossed out, saying it showed Huhn intended to kill Fiola and Jimmy Varone, and argued Huhn and his codefendants would have killed Fiola but for the police intervention, his comments were not based on matters in evidence and were inflammatory, thus prejudicing the jury.
Appellant says the so-called psychological interpretation was the prosecutor's opinion that Huhn was guilty, and that this is improper. He also says he should not be forced to defend against charges for which he is not on trial.
Appellant has considerably embroidered the prosecutor's statement. What the prosecutor said was that subconsciously Huhn was crossing out Fiola and Jimmy when he crossed out their names. This need not at all mean that Huhn intended to kill Fiola but for the intervention of the police. Moreover, there was evidence that Huhn threatened to kill Fiola.
We think the prosecutorial remarks can be read as either a pronouncement on Huhn's guilt or as stating facts not part of the evidence only by putting a strained interpretation of them. It is true that a prosecutor may not attempt to transform his own courtroom observation into *592 an evidentiary fact, Courson v. State, 414 So.2d 207, 208 (Fla. 3d DCA 1982); but that is not by any stretch of the imagination what the prosecutor was doing here. He said merely that psychologists might say or that he might say that Huhn's cross-out of Fiola's and Jimmy's names was the psychological equivalent of killing them. He did not say or even imply that this had been shown by the evidence to be true.
As to the notion that the remarks put Huhn in the position of having to defend against charges not brought, that too seems somewhat farfetched. The cases cited by Huhn involve references to other crimes committed by the defendant, not the prosecutor's psychological interpretation of the defendant's subconscious thoughts.
It was unnecessary for the prosecutor to make these remarks, but it is highly unlikely that they contributed to Huhn's conviction. The prosecutor was perhaps overzealous, but that does not necessarily lead to reversal. See State v. Murray, 443 So.2d 955 (Fla. 1984) (The standard for reversal on the basis of prosecutorial error is whether the error was so prejudicial as to vitiate the entire trial). On remand, given our comments, the prosecutor should refrain from such remarks. What might be viewed as harmless here may not be the view on examination of a future record.

V.

SENTENCING
The state attempted to supplement the record by supplying the scoresheet that apparently was prepared, but this court denied the state's motion to supplement. We must presume there was no scoresheet at sentencing, as the record contains no scoresheet. The cases say that failure to have a proper scoresheet is a sufficient basis for reversal of the sentence. E.g., Kolbe v. State, 480 So.2d 694, 695 (Fla. 4th DCA 1985) ("It was also reversible error not to have a guidelines scoresheet available at sentencing. Finklea v. State, 471 So.2d 608 (Fla. 1st DCA 1985); Myrick v. State, 461 So.2d 1359 (Fla. 2d DCA 1984).") Because the judgment is reversed for errors discussed earlier, the irregularity of the sentencing becomes moot. However, we wish to avoid future error.
First, it appears that sentencing was done without a prepared guidelines worksheet being available, and that is error, which would have otherwise required resentencing.
Also under this issue, appellant contends that the trial court's reasons for departing from what should have been the guidelines sentence were not, under case law, clear and convincing reasons. The reasons given in a written order prepared by the trial court only upon instruction from this court were (1) psychological trauma and fear of imminent death inflicted upon the victim; (2) the circumstances of the offense, establishing that the defendant headed a large scale drug operation employing guns and terror to insure success; and (3) the guidelines sentence was insufficient for retribution, deterrence or rehabilitation and for the safety and the public.
Appellant cites numerous cases to support its contention that none of the three stated reasons for departure is a proper one. The state admits that psychological trauma to the victim is not a proper reason where fear by the victim is an element of the offense of which appellant is being convicted, State v. Cote, 487 So.2d 1039 (Fla. 1986), but argues that in this case repeated threats during Fiola's three day captivity are a proper basis for aggravation of the sentence.
An element of the crime of assault and aggravated assault under Florida law is creation by the defendant of a well-founded fear in the victim. Cote, 487 So.2d at 1039. Huhn, like Cote, was convicted of aggravated assault. An inherent component of the crime of which the defendant is convicted cannot be used by the sentencing court to justify departure from the guidelines sentence. Id.
The state concedes that inasmuch as Huhn was neither charged with nor convicted of drug-related crimes, it was not proper to use such involvement as a cause for departure form the guidelines sentence. *593 However, the state urges the court really was referring to the kidnapping scheme as the outgrowth of the drug trafficking involvement. We do not see how the state derives this interpretation of the second stated reason for departure, nor do we see that what the state says the trial court meant would be an appropriate reason for departure. The state says that masterminding the crime has been held to be a clear and convincing reason for a departure sentence in Brinson v. State, 478 So.2d 1174 (Fla. 2d DCA 1985), but we do not think that is what was said in Brinson, nor what the trial court here was saying; and that running a well-organized criminal enterprise is a proper reason for departure, Garcia v. State, 454 So.2d 714 (Fla. 1st DCA 1984). We think that case stands only for the propriety of a departure based on the risks to others occasioned by the defendants' conduct at the time of their apprehension, and the fact the defendants engaged in a crime binge during the two-day period during which the offenses of which they were convicted, occurred.
As to the last reason for departure stated by the trial court, the state correctly observes that the First District Court of Appeal has held insufficient retribution, deterrence and rehabilitation under the guidelines sentence to be an acceptable reason for departure. Mincey v. State, 460 So.2d 396 (Fla. 1st DCA 1984); Williams v. State, 454 So.2d 756 (Fla. 1st DCA 1984). This court has not agreed, however, and the Florida Supreme Court has vindicated its view. Most recently, in Baldwin v. State, 494 So.2d 503 (Fla. 4th DCA 1986), this court called attention to Williams v. State, 492 So.2d 1308 (Fla. 1986), in which the Florida supreme court shot down, as a departure reason, "the fact that [the defendant] `has engaged in a violent pattern of conduct which indicates a serious danger to society'... ." Baldwin also states that the fact the defendant was dealing in cocaine at the time of the offense of which he was convicted could not be used as a basis for departure.
HERSEY, C.J., and DOWNEY, J., concur.

ON MOTION FOR REHEARING
PER CURIAM.
The state seeks rehearing with respect to that portion of our opinion which deals with psychological trauma. Because our opinion preceded State v. Rousseau, 509 So.2d 281 (Fla. 1987), the decision of this state's highest court shall control any future consideration of this defendant's sentence, should that become necessary, and we clarify our opinion to direct the trial court to follow the tests recited therein.
HERSEY, C.J., and DOWNEY and GLICKSTEIN, JJ., concur.