# Supreme Court of Florida

_____

No. SC15-2136
_____

**BESSMAN OKAFOR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 8, 2017]

PER CURIAM.

Bessman Okafor appeals his conviction for the September 10, 2012, first-degree murder of Alex Zaldivar and his resultant sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. We affirm Okafor's conviction but, because the jury did not unanimously find the facts necessary to impose death and did not render a final unanimous verdict to recommend the death penalty, we vacate his death sentence and remand for a new penalty phase.

## STATEMENT OF THE CASE AND FACTS

The testimony presented at trial demonstrated that Brienna Campos, Remington Campos, Brandon Campos, and Alex Zaldivar resided at a home owned

by the Camposes' parents in Ocoee, Florida. At around noon on May 9, 2012, Brienna, Brandon, and a friend, William Harrington, were watching television in the living room. Alex was asleep in his room and Remington was at work. Brienna, Brandon, and William saw a blue or purple Monte Carlo drive up and down the street and assumed that someone was lost. Subsequently, two men rang the doorbell and Brandon answered. They put guns in Brandon's face and ordered him back inside. The men followed Brandon in, ordered Brienna, Brandon, and William to lie face down and found Alex in his room and ordered him out to join the others. They used video game controllers and costume handcuffs to tie the victims up. The men asked whether the home was a grow house and inquired where the drugs and money were. When they found neither, the men took some bags, some smaller electronic items, a small amount of cash, and Brandon's house keys and left. William was able to release himself from the costume handcuffs and untie the Camposes. They were able to then call the police. William was able to use the find my phone feature on his cellular phone to help the police track the assailants. Brienna, Brandon, and William rode with police to another location and identified Okafor and Nolan Bernard as the two men who had just invaded their home as well as the Monte Carlo the men had driven.

Bernard and Okafor were arrested and the stolen items were returned. Bernard was jailed awaiting trial, but Okafor was fitted with an ankle monitor and

released on home confinement to the residence owned by his sister, Takeethia Ruffin. Okafor's trial for the May 9 home invasion was set for September 11, 2012. Brienna, Brandon, Alex, and William were scheduled to testify.

On August 24, 2012, Okafor sent a text message to someone named "Dorey" asking "did you get that?" to which Dorey responded "it's here with a full clip." Okafor also told Dorey that his lawyer had informed him that all the witnesses were planning to show up. On September 9, 2012, Okafor exchanged text messages with a friend, Antoine McLaren. Okafor texted that he was worried about his case and asked McLaren to procure a hoodie and gloves because he was worried about returning to jail. Okafor texted "I can't let them show up." McLaren declined to procure the items.

On September 10, 2012, at approximately 3:45 a.m., Okafor called Sherria Gordon and told her to get ready because he was coming to pick her and her children[1] up. Okafor picked Sherria up from her home in Takeethia's white Malibu and dropped the children off to continue sleeping at Takeethia's house. Okafor's ankle monitor corroborated this evidence, showing him away from his home from 3:49:27 to 4:08:28 a.m. Sherria and Okafor drove to Nesly Ciceron's

---

1. Sherria was seven months pregnant with Okafor's child at the time and had a six-year-old daughter with him and another daughter from a previous relationship.

house, where Okafor woke Nesly, handed him the keys to a white Taurus, and instructed him to follow Okafor. As they were driving, Nesly pulled up beside Okafor and indicated that the Taurus needed gas. Both cars stopped at a Marathon gas station where Sherria was filmed paying for the gas purchase at 4:45 a.m. After refueling, both cars continued to an abandoned house where they met Donnell Godfrey and Emmanuel Wallace who were driving Candace Ruffin's white Impala.[2]

Okafor handed Emmanuel's phone to Nesly and asked him to remain at a described location and to call if he heard police approaching. Okafor likewise instructed Sherria to wait at a location and to call if she heard police approaching. Okafor, Donnell, and Emmanuel drove the Impala to the Camposes' neighborhood. They were filmed by three surveillance cameras located at a house on the corner near the crime scene. The footage showed a white Impala passing by one of the cameras at 5:07 a.m. The video recording contained audio of four gunshots, with the first occurring at 5:21 a.m. followed by three consecutive shots. The cameras then showed the Impala heading in the opposite direction at 5:24 a.m.

_____

2. Candace is Okafor's sister. Emmanuel is Bernard's cousin. Additionally, Okafor had two children with Emmanuel's sister, Pearl Wallace, a son who died as an infant from SIDS and a daughter who died the week before trial at the age of eleven. Donnell Godfrey has a child with Bernard's sister.

At the Camposes' residence, Brienna and Remington were awakened by the sound of Brienna and Brandon's dogs barking.  Brienna testified that she was pulled out of her room by a tall, lanky man who wore a long-sleeved shirt, pants, and a t-shirt covering his head so that she could only see his eyes and hairline.  The unidentified man showed her his pistol and forced her out of her bedroom to the living room and had her lie face down.  Alex was already lying face down and she was placed so close that their heads touched.  Remington testified that he was removed from his bedroom by a heavy-set man with short dreads carrying a Glock pistol.  On his way to the living room, Remington observed a tall, thin man with long dreads carrying an AK-47 assault rifle.  Both Brienna and Remington testified to seeing only two assailants.

One of the assailants did all the talking.  He asked "where are the other two?" presumably referring to Brandon and William who were present at the May 9 home invasion.  He also asked "who is the naked guy?" referring to Remington who had not been present for the May 9 home invasion.  He asked about the drugs and money and Brienna said "you're going to be disappointed just like you were before."  Both Brienna and Remington testified that he said "someone is going to get shot tonight."  Brienna testified that she thought the statement was just made to scare them.  Brienna and Remington both testified that they heard the sound of rubber gloves snapping into place before hearing the first shot.  Brienna testified

- 5 -

that after she heard the first shot, she thought it had been a mistake due to adrenaline. She felt the pressure on the left side of her head. She then heard two more gunshots. Remington heard the first shot and said he knew Brienna had been hit because he knew it wasn't right next to him or himself. Remington heard the second shot and heard Alex stop breathing. He then heard the third shot and said it felt like someone had dropped bricks on the back of his head and blood started blocking his vision. The assailants left and Brienna and Remington climbed over their back fence to their neighbors' home. Amy Scott answered the door and saw the two of them covered in blood. Brienna used the Scotts' phone to call police, who responded at 5:24 a.m.

Video surveillance captured the white Impala leaving the neighborhood around the same time. Sherria testified that Okafor called her and told her to return to the abandoned house. When she arrived, the other two cars were there. Nesly testified that he left his location before he was instructed but nevertheless returned to the abandoned house to await the others' return. He testified that he was the first car to arrive back, followed by the Impala, followed by Sherria in the Malibu. Nesly testified that Godfrey was driving the Impala on the return trip and that Okafor got out of the Impala and into the car with Nesly who then drove Okafor home. Sherria testified that Godfrey got into the car with her and she drove him down the street until he indicated where to let him out. She then returned to

- 6 -

Takeethia's house, where Okafor was already standing outside. She and Okafor then went to bed.

Okafor's jury trial commenced on August 10, 2015. At the end of the trial, the jury convicted him of one count of first-degree premeditated murder, two counts of attempted first-degree murder, and one count of armed burglary of a dwelling with explosives or a dangerous weapon. The penalty phase commenced on August 27, 2015.

At the penalty phase, the State presented testimony from Brienna Campos, Remington Campos, Denise Zaldivar, Richard Zaldivar, Kyoko Zaldivar, and Rafael Saldivar. Okafor presented testimony from Trenton James, Catalina Ruffin Sinclair, Trevor Sinclair, Marcia Pete, Dr. Edward Taylor, and Dr. Stephen Gold. The jury voted eleven to one to sentence Okafor to death. The Spencer[3] hearing occurred on October 13, 2015, where the State presented testimony from Kyoko,

---

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Rafael, and Brienna. Afterwards, the trial court found four aggravating

circumstances,[4] thirteen mitigating circumstances,[5] and sentenced Okafor to death.

First, Okafor argues that the trial court erred in striking Juror 105 for cause

based on his allegedly equivocal responses to whether he would be able to impose

the death penalty after determining it was the appropriate punishment. We

conclude that there was no error.

> A trial court has great discretion when deciding whether to
> grant or deny a challenge for cause based on juror competency.
> Barnhill v. State, 834 So. 2d 836, 844 (Fla. 2002), cert. denied, 539
> U.S. 917 (2003). This is because trial courts have a unique vantage
> point in their observation of jurors' voir dire responses. Therefore,
> this Court gives deference to a trial court's determination of a

---

4. The trial court found the following aggravating circumstances: (1) Okafor was previously convicted of another felony involving the use or threat of force or violence to the person; (2) the capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws; (3) the murder was especially heinous, atrocious, or cruel; (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

5. The trial court found the following nonstatutory mitigating circumstances: (1) codefendants received lower sentences (little weight); (2) untreated learning disability (some weight); (3) being abandoned, neglected, and separated from paternal family (some weight); (4) difficult childhood and upbringing (some weight); (5) anxiety, aggression, and poor impulse control (some weight); (6) suffered the loss of a son and daughter (some weight); (7) suffered the loss of a parent (some weight); suffered physical, verbal, and emotional abuse (moderate weight); (8) suffered sexual abuse and provided no counseling (significant weight); (9) emotionally and physically neglected (some weight); (10) suffered domestic violence (little weight); (11) suffered from household alcoholism (little weight); (12) household member was incarcerated (little weight); and (13) exhibited exemplary courtroom behavior (very little weight).

> prospective juror's qualifications and will not overturn that determination absent manifest error. Hertz v. State, 803 So. 2d 629, 638 (Fla. 2001), cert. denied, 536 U.S. 963 (2002). Where a prospective juror is challenged for cause on the basis of his or her views on capital punishment, the standard that a trial court must apply in determining juror competency is whether those views would prevent or substantially impair the performance of a juror's duties in accordance with the court's instructions and the juror's oath. Id. (citing Wainwright v. Witt, 469 U.S. 412, 424 (1985)). "In a death penalty case, a juror is only unqualified based on his or her views on capital punishment, if he or she expresses an unyielding conviction and rigidity toward the death penalty." Barnhill, 834 So. 2d at 844.

Conde v. State, 860 So. 2d 930, 939 (Fla. 2003); see Fernandez v. State, 730 So. 2d 277, 281 (Fla. 1999). We have previously held that a juror's "[p]ersistent equivocation or vacillation . . . on whether he or she can set aside biases or misgivings concerning the death penalty in a capital penalty phase supplies the reasonable doubt as to the juror's impartiality which justifies dismissal." Hurst v. State, 202 So. 3d 40, 62 (Fla. 2016) (quoting Johnson v. State, 969 So. 2d 938, 947-48 (Fla. 2007)).

The record demonstrates that Juror 105 never clearly stated that he could follow the law. Even when directed to assume that he had determined that the death penalty was appropriate in this case, Juror 105 stated he was unsure that he could vote to recommend it. Accordingly, the trial court did not err in dismissing Juror 105 for cause.

Next, Okafor argues that the trial court erred in permitting the State to introduce evidence of high capacity .22 and .223 caliber magazines recovered from

Emmanuel Wallace's residence. The State argues that the magazines were relevant to establish that it was Wallace who carried the AK-47 described in Remington Campos' testimony. We conclude that the trial court erred in admitting the evidence, but that the error was harmless.

> In order to be admissible, evidence must be relevant. That is, the evidence must "tend [ ] to prove or disprove a material fact." § 90.401, Fla. Stat. (2012). While relevant evidence is generally admissible, such evidence "is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." §§ 90.402-403, Fla. Stat. (2012). "A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion." Jorgenson v. State, 714 So. 2d 423, 427 (Fla. 1998) (citing Heath v. State, 648 So. 2d 660, 664 (Fla. 1994)).

Davis v. State, 207 So. 3d 177 (Fla. 2016), petition for cert. filed, No. 16-8570 (U.S. Mar. 31, 2017).

The evidence here was not relevant. Despite the State's argument, the magazines did not tend to establish the identity of the assailant carrying the AK-47 because an AK-47 does not fire .22 caliber or .223 caliber rounds. Accordingly, the discovery of high capacity magazines of those calibers did not corroborate Remington's testimony that one of the assailants carried an AK-47, nor did it establish that Wallace was that assailant. See Huhn v. State, 511 So. 2d 583, 589 (Fla. 4th DCA 1987) (finding a gun not relevant when there was nothing unlawful about owning the gun itself and nothing connecting that particular gun to the

crime).  However, such error was harmless because Wallace's ownership of .22 and .223 caliber high-capacity magazines was not prejudicial to Okafor.  See Herman v. State, 396 So. 2d 222, 229 (Fla. 4th DCA 1981) ("There being no reasonable basis upon which a different verdict could have been reached, if admission of the shotgun[, where the State's expert testified it was not likely the gun used in the crime,] was error, it was harmless.").

Next, even though not challenged by Okafor, we have an independent duty to review the evidence to determine whether there is competent, substantial evidence to sustain the conviction in this case.  We conclude that the record contains competent, substantial evidence to support this conviction.  The evidence presented at trial demonstrated that on May 9, 2012, Bessman Okafor and Bernard entered the Camposes' home while armed and took money and electronics.  After their arrest, trial was scheduled to begin on September 11, 2012.

The day before trial, Brienna, Remington, and Alex were asleep in their home.  Brienna awoke to the sound of her dog barking and was pulled out of bed by a tall, lanky man carrying a pistol.  Remington awoke to the sound of both his siblings' dogs barking and was pulled out of bed by a short, heavy-set man with short dreads carrying a Glock.  Remington also saw a tall, lanky man with long dreads carrying an AK-47.

Brienna, Remington, and Alex were placed face down next to each other, so close that their heads were touching. Brienna testified that she heard the first shot fire, thought it was an accident, and then felt herself be shot. Remington testified that he heard Brienna and Alex being shot before he felt himself shot. The State presented testimony from a firearms expert who testified that the projectiles recovered were from a .38 caliber handgun that could not have been a Glock. She further testified that because no shell casings were recovered, the handgun was likely a revolver and not a semi-automatic.

Testimony demonstrated that Okafor arranged for Sherria and Nesly to serve as lookouts. Okafor, Wallace, and Godfrey were filmed by the neighbor's surveillance camera arriving at the crime scene. Text messages, cellular data, and Okafor's ankle monitor all demonstrate that he coordinated the crime and was at the crime scene during the time the murder took place.

While neither Brienna nor Remington testified that they saw a man who fit Okafor's description, and were only able to describe Wallace and Godfrey, they both testified that one of the assailants asked questions that would only make sense if he had been present at the May 9 incident. Specifically, they testified that the unidentified assailant asked "where are the other two" presumably referring to Brandon and William who were present at the May 9 incident but not at the September 10 incident. He also asked "who is the naked guy?" presumably

referring to Remington, who was present at the September 10 incident, but not the May 9 incident. The unidentified assailant would likely have only been able to identify the victims this way if he had been physically present at both incidents and the only other person other than Okafor who was at the May 9 incident, Nolan Bernard, was in jail awaiting trial.

The jury could reasonably conclude that Okafor planned, coordinated, and executed the murder and attempted murders in this case. Accordingly, we find competent, substantial evidence in the record to affirm Okafor's conviction for the first-degree murder of Alex Zaldivar.

Lastly, Okafor argues that because the jury did not unanimously find the facts necessary to sentence him to death and did not unanimously recommend the death sentence, Florida's capital sentencing scheme and his death sentence are unconstitutional in light of the United States Supreme Court's decision in Hurst v. Florida, 136 S. Ct. 616 (2016), and this Court's decision in Hurst v. State, 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998 (U.S. May 22, 2017). We agree. See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) (citing Hurst, 202 So. 3d at 41). We explained in Hurst "that the Supreme Court's decision in Hurst v. Florida requires that all the critical findings necessary before the trial court may consider imposing a sentence of death must be found unanimously by the jury." Hurst, 202 So. 3d at 44. We also held, "based on Florida's requirement for unanimity in jury

verdicts, and under the Eighth Amendment to the United States Constitution, that in order for the trial court to impose a sentence of death, the jury's recommended sentence of death must be unanimous." Id. Because the jury vote in this case was eleven to one, and the aggravating factors required factual determinations by the jury, the Hurst error in this case was not harmless beyond a reasonable doubt. See, e.g., Franklin, 209 So. 3d at 1248.

In Hurst, this Court determined that Hurst v. Florida error is capable of harmless error review and set forth the following test:

> The harmless error test, as set forth in Chapman[v. California, 386 U.S. 18 (1967),] and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.

Hurst, 202 So. 3d at 68 (quoting State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)). We stated that a sentencing error is only harmless "if there is no reasonable probability that the error contributed to the sentence." Id. (citing Zack v. State, 753 So. 2d 9, 20 (Fla. 2000)). To find the error harmless in this case, we would be required to speculate why one juror was "persuaded that death was not the appropriate penalty." Id. at 69. We therefore find that the Hurst error in this case is not harmless beyond a reasonable doubt and Okafor is entitled to a new penalty phase. See id.

Because we find that <u>Hurst</u> requires that Okafor receive a new penalty phase, we decline to address the remaining issues on appeal.  We affirm Okafor's conviction and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur as to the conviction and dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LAWSON, J., concurring specially.

I fully concur in the majority's decision to affirm Okafor's conviction.  I have also elected to concur in the majority's decision to vacate Okafor's death sentence now that the United States Supreme Court has denied certiorari in <u>Hurst v. State</u> (<u>Hurst</u>), 202 So. 3d 40 (Fla. 2016), <u>cert. denied</u>, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).  Although I continue to view this Court's decision in <u>Hurst</u> as misguided for the reasons expressed in Justice Canady's <u>Hurst</u> dissent, <u>see</u> <u>Hurst</u>, 202 So. 3d at 77-83 (Canady, J., dissenting), the Supreme Court's denial of certiorari renders <u>Hurst</u> final, solidifying it as this Court's precedent.

While I recognize that I am not necessarily bound by our precedent and could continue to dissent and express my disagreement, my duty is to faithfully apply Florida law to the issues raised by those litigants whose sole state court

- 15 -

appeal right is in our Court.  At this point, <u>Hurst</u> is the law in Florida—whether I agree with it or not—and issues governed by our <u>Hurst</u> precedent will continue to be decided by our Court in pending death penalty proceedings for at least several more months.  Accordingly, I concur in the decision to grant <u>Hurst</u> relief because that is what a faithful application of now-settled Florida law requires in this case.

An Appeal from the Circuit Court in and for Orange County,
    John Marshall Kest, Judge - Case No. 482012CF014950000AO

Valarie Linnen, Atlantic Beach, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Vivian Singleton, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee