835 So.2d 1226 (2003)
Nyka O'CONNOR, Appellant,
v.
STATE of Florida, Appellee.
No. 4D01-1170.
District Court of Appeal of Florida, Fourth District.
January 29, 2003.
*1227 Richard L. Rosenbaum of Law Offices of Richard L. Rosenbaum, Fort Lauderdale, for appellant.
*1228 Charlie Crist, Attorney General, Tallahassee, and Douglas J. Glaid, Assistant Attorney General, Fort Lauderdale, for appellee.
GROSS, J.
Nyka O'Connor was convicted as a principal of first-degree murder and armed robbery. We reverse because certain items seized from his room thirty-six days after the homicide were improperly admitted into evidence and we do not find harmless error.
Appellant was indicted along with co-defendant Marlon Foster on the charges of first-degree murder and armed robbery. Foster was tried separately from O'Connor.
The homicide victim was Clifford Clarke. A police officer discovered Clarke slumped over in the driver's seat of his car. Clarke died from a single gunshot wound to the right side of his head, behind the ear. The shot was fired by a handgun from a distance of no more than two feet. The bullet that killed Clarke was a nine millimeter Remington brand Golden Saber hollow point.
At trial, appellant's lawyer announced his theory of defense in the opening statement: "[D]id my client knowingly participate in an armed robbery? No, he was there to commit a felony, absolutely. He was there to sell fake drugs." Under this approach, if appellant was not a principal in the armed robbery, he was not guilty of first-degree felony murder. See § 782.04(1)(a)2.d., Fla. Stat. (2001) (emphasis added).
The police conducted a search of appellant's home thirty-six days after the shooting. He objected to the introduction of three items discovered there: a photo of a shotgun found in appellant's room, a photo of a bullet proof vest, and a photo of a quotation found above appellant's bed.
The state argued that the bullet proof vest and shotgun were probative of appellant's motive and mental state, rebutting the defense that he was in the victim's car only to sell fake cocaine, that he "was in the wrong place at the wrong time." The court overruled appellant's objections and admitted photographs of the shotgun and the bullet proof vest into evidence.
A detective testified that people often wear a bullet proof vest when they are doing a "drug armed robbery" to make sure that the drug purchaser does not shoot and harm them during the robbery. On cross-examination, the detective acknowledged that there was no evidence linking the bullet proof vest to the shooting in this case. Also, the detective conceded that in his eleven-year police career, he had encountered only two occasions where a drug robber wore a bullet proof vest. The detective agreed that the victim had been shot by a handgun, and not a shotgun like the one found in appellant's bedroom.
Above appellant's bed on the day of the search was a quotation:
Lord, grant me the serenity to accept the things I cannot change, the courage to change the things I can, and the wisdom to hide the bodies of those people I had to kill because they pissed me off.[1]
*1229 The state argued that the statement was relevant to rebut defense counsel's opening statement, which portrayed appellant as a young man from Jamaica, whose intention was not to hurt or rob the victim, but only to sell him fake cocaine. The defense argued that the statement was not relevant and that there was no evidence that appellant had ever encountered the victim before. The state countered with its theory that it was appellant who had shot the victim,[2] so the shooting was evidence that the victim had in some manner "pissed off" appellant, thereby making the quote relevant. The trial court overruled appellant's objection and admitted the quotation into evidence.
Appellant's tape-recorded statement was the most significant piece of evidence linking him to the homicide. Appellant admitted that he held a quarter of a kilogram of fake cocaine for Foster, a friend he had known for several years. Appellant and Foster had numerous conversations on the day of the homicide; at one point, they held a three-way conversation with a third person to set up a cocaine deal for that evening.
According to the statement, Foster and the victim picked up appellant, who had the counterfeit cocaine. The victim was driving the car. He said that he wanted to test the cocaine at appellant's house, to make sure it was real. Foster shot the victim, and the car spun out of control. After the car came to a stop, Foster told appellant to get the money from the victim's pocket. Instead, it was Foster who took the money. The two men fled to appellant's house.
O'Connor's statement indicated that once at the house, he and Foster took off their bloody clothes and put them in a garbage bag. Foster put on some of appellant's clothes. Foster threw the bag in a dumpster near a supermarket. Appellant did not know what Foster did with the gun. At Foster's request, appellant drove Foster to the scene of the shooting. Foster took a wet cloth and wiped down the victim's car, attempting to eliminate any fingerprints. To concoct an alibi, Foster *1230 had appellant call one of Foster's friends and ask for Foster's whereabouts.
O'Connor admitted in the statement that Foster gave him about $2,000 of the money he had taken from the victim. Appellant said that he kept two nine millimeter guns at his house for Foster, because Foster did not want his mother to know about them. Appellant admitted to keeping other items at his house for Foster: the fake cocaine wrapped in duct tape, clear plastic baggies containing fake cocaine rocks, and two bundles of cash. Appellant acknowledged that the shotgun found at his residence was his own.
During the tape-recorded statement, appellant denied shooting the victim, stating, "I ain't know the shooting was going to happen." He maintained that Foster had shot the victim and explained the shooting by saying: "[T]he shit would come back to [me] anyways."
The jury found appellant guilty of first-degree murder as charged in the indictment. Also, the jury answered three interrogatory questions, that, "during the course of the crime committed," appellant did not "actually possess a firearm," "actually discharge a firearm," or "actually inflict death to Clifford Clarke as a result of discharging a firearm in his possession."
Appellant raises a number of points on appeal. We affirm all points but one. Specifically, we affirm the trial court's finding that appellant's tape-recorded statement was freely and voluntarily rendered and approve its admission into evidence. We affirm the trial court's denial of appellant's motion for judgment of acquittal. Appellant preserved none of the errors he complains of during the prosecutor's closing argument and none of the errors amounted to fundamental error.
The major issue on this appeal is the admission into evidence of the photographs of the shotgun, the bullet proof vest, and the quoted phrase.
Evidence must be relevant in order to be admissible. See § 90.402, Fla. Stat. (2001). Relevant evidence is defined as evidence "tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2001). While all admissible evidence must be relevant, not all relevant evidence is admissible; section 90.403 mandates that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice." § 90.403, Fla. Stat. (2001).
It is well-settled that weapons uncovered in a search of premises controlled by a defendant can be admissible in evidence. However, in these cases, some part of the evidence at trial linked the seized item to the crime charged. Thus, in Dias v. State, 812 So.2d 487, 493 (Fla. 4th DCA 2002), we held that a knife found in the defendant's van three weeks after a stabbing was admissible because it was similar to the victim's description of the knife used in the incident.
Similarly, in Council v. State, 691 So.2d 1192, 1194-96 (Fla. 4th DCA 1997), we upheld the admission into evidence of a gun found under the defendant's mattress during a search three weeks after a robbery. During the robbery of a doctor's office, the defendant had pulled a gun from his waist area and threatened employees with it, finally pressing the gun to the office manager's temple. There were "many similarities" between the witnesses's description of the gun used by the robber and the gun found under the mattress. Id. at 1194. We held that "[t]hese common characteristics were sufficient to establish the gun's probative value on issues material to the case." Id.; see also Thornton v. State, 767 So.2d 1286, 1288 (Fla. 5th DCA 2000) (holding that gun located in co-defendant's office was properly admitted to help identify the defendant as a participant in a robbery; the witnesses's *1231 description of the gun used in the robbery "matched the appearance" of the gun admitted in evidence).
On the other hand, where the evidence at trial does not link a weapon seized to the crime charged, the weapon is inadmissible. In Rigdon v. State, 621 So.2d 475 (Fla. 4th DCA 1993), the defendant was charged with attempted murder. We concluded that the trial court erred in admitting into evidence a small semi-automatic weapon which the police found under the defendant's bed. We reasoned that the "exhibit did not tend to prove or disprove a material fact as it had no connection whatsoever to the charged offense." Id. at 478.
Similarly, in Huhn v. State, 511 So.2d 583 (Fla. 4th DCA 1987), a defendant convicted of armed kidnapping and aggravated assault with a firearm challenged the admissibility of a gun removed from the glove compartment of a car he was driving five months after the crimes charged. Nothing in the evidence "connect[ed] the particular gun to the crimes for which [the defendant] was on trial." Id. at 589. Concluding that the gun was not relevant to the case and therefore inadmissible, this court wrote that "it served the purpose only of conveying to the jury that [the defendant's] having guns tended to support the testimony that he had a gun when engaged in the charged crimes." Id.; see also Fugate v. State, 691 So.2d 53, 54 (Fla. 4th DCA 1997) (finding trial court committed error in admitting into evidence a handgun owned by the defendant which was found some distance from the crime scene of an aggravated assault, where there was no link to the charged offense); Sosa v. State, 639 So.2d 173, 174 (Fla. 3d DCA 1994) (holding that trial court erred in admitting bullets found in defendant's vehicle where defendant was charged with firing handgun at victim's car, since there was no link whatsoever established between the bullets and the defendant's case).
Following Fugate, Rigdon, Huhn, and Sosa, we conclude that photographs of the shotgun, the bullet proof vest, and the quote, were not relevant to the crime charged and were improperly admitted into evidence. The murder was by a handgun with nine millimeter ammunition, not a shotgun, and nothing in the evidence connected the shotgun to the homicide. Similarly, nothing in the evidence indicated that appellant wore the bullet proof vest in the homicide. The state tried to manufacture relevance with the testimony that people who commit drug armed robberies often wear bullet proof vests. This anecdotal testimony "concerning characteristic patterns in a type of criminal activity was inadmissible." Lawrence v. State, 766 So.2d 250, 251 (Fla. 4th DCA 2000); see also Dean v. State, 690 So.2d 720, 723-24 (Fla. 4th DCA 1997); Shelton v. State, 654 So.2d 1295, 1296 (Fla. 4th DCA 1995). Any marginal relevance in this type of testimony was substantially outweighed by the danger of unfair prejudice. See § 90.403. The state may not create relevance by resorting to testimony which is itself inadmissible as proof of guilt.
Finally, we disagree with the state that the sign over the defendant's bed "had a logical tendency to rebut" the defense that appellant "was unaware that an armed robbery of the victim was to take place." Nothing in the evidence supported the theory espoused by the state at trial to admit the signthat appellant was the shooter. In fact, the jury specifically found otherwise. The sign is an example of a genre of humor, the "folk wisdom" found on bumper stickers or bathroom walls. See supra, note 1. It is not probative of appellant's state of mind in this case, any more than possession of "The Godfather" DVD would *1232 demonstrate a predisposition for homicide in resolving business problems.
The final question is whether the admission of these pieces of evidence was harmless error. Under State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986), if the admission of erroneous evidence does not contribute to the guilty verdict and was harmless beyond a reasonable doubt, the verdict must stand. As later clarified by the supreme court:
[I]f one cannot say, with fair assurance, after pondering all that happened without stripping that erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

Goodwin v. State, 751 So.2d 537, 539-40 (Fla.1999). We do not find harmless error in this case. Much depended on how the jury viewed appellant's tape-recorded statement. The admission of the three disputed items could well have affected the jury's decision.
Affirmed in part, reversed in part, and remanded for a new trial.
KLEIN and TAYLOR, JJ., concur.
NOTES
[1] The quotation is not to be taken literally, but is an example of black humor. The quotation is part of the "Serenity Prayer" or "Daily Affirmation" or "Prayer for the Stressed," a version of which appears on many humor websites. See, e.g., http://www.medic37. net/prayer.shtml (last visited Jan. 8, 2003); http://www.tasgreetings.com/grantme.htm (last visited Jan. 8, 2003); http.//www.midusa.net/russell/stressed.html (last visited Jan. 8, 2003); http://www.stiltner. org/humr/humresere.htm (last visited Jan. 8, 2003); http://www.joke-archives.com/poetry/serenity.html (last visited Jan. 8, 2003); http://www.c4vct.com/kym/humor/seren.htm (last visited Jan. 8, 2003); http:// www.geocities.com/be_alternative/serenity_prayer.html (last visited Jan. 8, 2003). To place the quotation in context, many versions of the "prayer" include the following:

And also, help me to be careful of the toes I step on today
As they may be connected to the ass that I may have to kiss tomorrow.
Help me to always give 100% at work:
12% on Monday
23% on Tuesday
40% on Wednesday
20% on Thursday
5% on Fridays
http://www.geocities.com/bealternative/serenitypra yer.html (last visited Jan. 8, 2003).
The "Serenity Prayer" is a variation of a prayer by Reinhold Niebuhr, which was originally part of a sermon in 1943 and later used by Alcoholics Anonymous:
God, give us grace to accept with serenity the things that cannot be changed, courage to change the things which should be changed and the wisdom to distinguish the one from the other.
http://www.bartleby.com/63/38/4238.html (last visited Jan. 8, 2003).
[2] During closing argument, the prosecutor argued this theory to the jury:

Nyka O'Connor was the person who actually killed Clifford Clarke. I suggest to you absolutely positively that he is the shooter. No doubt about it.
Although the state argued this theory, there was no direct evidence of the shooting. Appellant did not testify; the only evidence that came from his mouth was his tape-recorded statement accusing Foster of being the shooter. Foster did not testify.