TAYLOR, J.
This appeal arises from a triple shooting in Broward County, which left one person dead and two wounded. Markinsey Me-tayer appeals his conviction for first degree murder. Of the several issues he raises for reversal, we find that only one has merit.[1] We hold that the trial court abused its discretion in admitting evidence of a firearm and ammunition found in appellant’s mother’s house six months after the shooting incident, because there was no evidence linking these items to the crime.
The tragic shooting incident occurred in a Broward County home in the early morning hours of July 22, 2007. Following the incident, appellant and co-defendant *1005 Patrick Young were charged by indictment with Murder in the First Degree of Adam Jacobs (Count I), Attempted Murder in the First Degree of Jason Operle (Count II), Attempted Murder in the First Degree of Gregory Hunt (Count III), Armed Robbery of Adam Jacobs (Count IV), and Armed Robbery of Jason Operle (Count V).
At trial, Operle testified that late in the evening on July 21, 2007, he and his best friend, Jacobs, went out and had a few drinks. By around 5:80 a.m. on July 22, 2007, they returned to the house in Coral Springs where Jacobs was staying. They drank more alcohol and smoked a cigar rolled with marijuana and cocaine.
That morning, Jacobs received several calls on his cell phone from his friend, co-defendant Young. Young told Jacobs that he was going to stop by the house. Operle was friendly with Young. Operle testified that both Young and Jacobs were drug dealers. When Young arrived at the house, appellant was with him. Operle had never seen appellant before.
They all sat down to eat breakfast at a table in the living room area. Operle laid down on a couch in the living room after finishing his meal. After Young and Jacobs completed a marijuana transaction, Young asked Jacobs about his gun. Jacobs then asked Young if he “was carrying.” Young answered in the affirmative and took his gun out of his right back pocket. Meanwhile, Jacobs retrieved his gun from a black bag and put it on the table. Young picked up Jacobs’s gun, comparing it to his gun.
As Jacobs was seated at the table eating, Young stood up, put one of the guns back down, and then shot Jacobs in the chest. Jacobs fell to the ground. Operle described Jacobs as “gasping for air.” Op-erle did not hear Jacobs say any words, but heard noise.
Operle screamed and tried to jump off the couch. Young walked over toward Op-erle and shot him in the front shoulder, causing Operle to fall off the side of the couch. Young pointed a gun in Operle’s face and pulled the trigger, but the gun jammed. Young told Operle to “get on the ground.” When Operle got on the ground, Young kicked him in the face. Young then shot Operle in the back, behind his right shoulder. Operle testified that he went into convulsions, had a seizure, and lost consciousness. Operle estimated that he was unconscious for about 15 seconds, but was not really sure.
Operle heard Young tell appellant to finish Jacobs off. According to Operle’s testimony, appellant got up, grabbed one of the guns, stood over Jacobs, and shot him in the face. Jacobs died at the scene. It was later determined that Jacobs was shot twice with his own .45 caliber pistol.
As Operle was playing dead, Young took Operle’s sneakers, wallet, and watch. Op-erle then heard Young and appellant going through the rest of the house. Operle eventually heard more gunshots in the house.
Meanwhile, Gregory Hunt was sleeping in the back bedroom of the home. He was awakened by several loud hand claps. Appellant opened the bedroom door and stuck his face inside. After Hunt indicated that the room was occupied, appellant shut the door. Shortly thereafter, Hunt heard a gunshot, the bedroom door flew open, and Young came into the bedroom with a gun. Young shot Hunt in the back of his shoulder. Young pulled the trigger again, but the gun jammed and the cartridge was ejected onto the mattress. Young demanded Hunt’s money, but Hunt did not have any. Young then shot Hunt again just above the hip. Hunt passed out *1006 and the next thing he remembered was hearing the front door close.
Young and appellant walked past Operle as they went out the front door. Operle never saw Young or appellant take any money or drugs. As soon as Operle heard the car leave, he called 911. Operle and Hunt were both taken to the hospital.
Between 7:00 a.m. and 8:00 a.m. on the morning of the shootings, Young and appellant arrived at the Miami home of Young’s girlfriend. Young was carrying a black bag. Young’s girlfriend later saw that the bag contained drugs, money, and a gun. She did not see any blood on Young’s body or clothing. Appellant left the house about five minutes later. Young put the money and drugs in a safe in his girlfriend’s bedroom closet. The following day, Young was arrested and the police recovered guns, drugs, and money from Young’s girlfriend’s house.
Appellant was arrested about six months later at his mother’s house in Miami. The police found a .40 caliber Smith & Wesson Glock pistol and two .45 caliber magazines in the house. Over appellant’s objection that these items were not linked to the crime, the trial court admitted testimony and photographs regarding these items.
One of the guns recovered from Young’s girlfriend’s house, a .40 caliber S & W Taurus Millennium model, was examined and test fired by Alan Greenspan, a firearms examiner. Mr. Greenspan explained that although a 10 millimeter cartridge is proper for a .40 caliber weapon, it is possible to use 9 millimeter ammunition. However, when 9 millimeter ammunition is used, “sometimes it will extract and eject and sometimes it won’t.” Greenspan testified that the casings found on the couch and in the dining room at the crime scene were fired from the above-referenced .40 caliber Taurus Millennium model. However, there were two spent projectiles recovered from Operle’s body at the hospital; they were the types of bullets that most commonly would be loaded in a 9 millimeter casing. There were insufficient markings for Greenspan to determine whether the .40 caliber Taurus Millennium gun fired those bullets. Greenspan testified that it was possible those bullets could have been fired from any .40 caliber weapon.
In October 2008, Jacobs’s .45 caliber Taurus Millennium pro-model, PT 145 pistol was recovered from the North Miami Police Department. After test firing that pistol, Mr. Greenspan concluded that all the .45 casings and projectiles found at the scene were fired from this gun.
After the state rested its case, appellant testified in his own defense. Appellant denied ever shooting Jacobs, and claimed that it was Young who fired both shots at Jacobs. Appellant stated that he was shocked when Young opened fire. Appellant claimed that after Young shot Jacobs a second time, Young then asked appellant, “Is he finished, is he finished?”
The jury found appellant guilty as charged on Count I, first-degree murder of Adam Jacobs, but not guilty on all remaining counts. As to Count I, the jury was given special verdict interrogatories and specifically found that appellant actually possessed and discharged a firearm, inflicting death upon Adam Jacobs.
On appeal, appellant maintains that the trial court abused its discretion in admitting into evidence two .45 magazines and a .40 caliber Glock pistol which were found in appellant’s mother’s house. Appellant argues that there was no evidence at trial which linked the pistol and magazines to the crimes charged. We agree with appellant’s argument.
*1007 A trial court’s decision on the admissibility of evidence is reviewed under an abuse of discretion standard. Hudson v. State, 992 So.2d 96, 107 (Fla.2008). That discretion, however, is limited by the rules of evidence. Id.
Relevant evidence is evidence tending to prove or disprove a material fact. § 90.401, Fla. Stat. (2009). Generally, any evidence relevant to prove a fact at issue is admissible unless precluded by a specific rule of exclusion. See State v. Williams, 992 So.2d 330, 333 (Fla. 3d DCA 2008); see also § 90.402, Fla. Stat. (2009). However, even if evidence is relevant, it is inadmissible “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.” § 90.403, Fla. Stat. (2009).
It is well-settled that in order for evidence of a firearm to be admissible as relevant in a criminal trial, the state must show a sufficient link between the weapon and the crime. See Agatheas v. State, 77 So.3d 1232, 1236-39 (Fla.2011) (admission of gun recovered from a backpack that defendant had in his possession five years after the murder was erroneous because it was not relevant to either the crime or corroborating a witness’s testimony; it was undisputed that the gun was not the murder weapon and had no connection to the charged crime); Jackson v. State, 25 So.3d 518, 528 (Fla.2009) (testimony regarding a “little pistol” defendant carried was inadmissible where nothing in the record linked the “little pistol” to the gun used in the crimes charged).
A gun different than the one used in a crime is not relevant to prove that the crime occurred. Downs v. State, 65 So.3d 594, 596 (Fla. 4th DCA 2011). Even if evidence of a defendant’s possession of a different gun is relevant to a material fact in issue, the court must perform the “critical balancing analysis” under section 90.403. Agatheas, 77 So.3d at 1240. Generally, any marginal relevance in this type of testimony is substantially outweighed by the danger of unfair prejudice under section 90.403. Downs, 65 So.3d at 596.
Accordingly, where the evidence at trial does not link a weapon seized from the defendant to the crime charged, the weapon is inadmissible. See, e.g., O’Connor v. State, 835 So.2d 1226, 1231 (Fla. 4th DCA 2003) (photographs of shotgun and bullet proof vest were not relevant to the crime charged and were improperly admitted into evidence); Rigdon v. State, 621 So.2d 475, 478 (Fla. 4th DCA 1993) (error to admit a semi-automatic weapon that had no connection to charged offense); Huhn v. State, 511 So.2d 583, 589 (Fla. 4th DCA 1987) (“Here, there is nothing unlawful about Huhn’s ownership of the gun, and nothing to connect the particular gun to the crimes for which Huhn was on trial. We conclude that the gun was not relevant to this ease.”); see also Zama v. State, 54 So.3d 1075, 1078 (Fla. 4th DCA 2011) (error for the state to present evidence that defendant possessed a bullet-proof vest unconnected to crime); Jones v. State, 32 So.3d 706, 712-13 (Fla. 4th DCA 2010) (error to admit gun-cleaning kit where nothing was shown to connect it to the crimes charged; its admission served only to suggest that at some point the defendant owned a gun).
Here, the state failed to show a sufficient link between the shootings and the firearm and ammunition found in appellant’s mother’s home. The only marginal relevance of the fact that a .40 caliber weapon was found at appellant’s mother’s home is that the state’s firearm expert testified that he could not determine whether the two projectiles that were recovered from Operle’s body were fired *1008 from Young’s .40 caliber Taurus Millennium. In other words, it was possible those projectiles could have been fired from a different .40 caliber weapon. The prosecutor thus argued to the jury that it was possible there was a third weapon at the scene.
However, the prosecutor’s argument regarding a possible “third gun” was, at best, pure speculation unsupported by any evidence. In fact, the prosecutor’s argument was inconsistent with the other evidence in the case, including Operle’s eyewitness testimony-that he saw two guns, and the evidence that Young’s .40 caliber Taurus weapon was definitely fired at the scene. ' The evidence reflected that all of the casings recovered at the crime scene either came from Jacobs’s .45 caliber pistol or co-defendant Young’s .40 caliber Taurus Millennium. There were no casings at the scene that came from any other firearm. Moreover, according to Operle’s testimony, co-defendant Young was handling both his own firearm and Jacobs’s firearm during the incident. Operle did not testify that he saw a third firearm or that appellant ever handed a different firearm to the co-defendant. Under the circumstances of this case, the mere fact that the gun expert could not conclusively determine that the bullets found in Operle’s body were fired from Young’s .40 caliber weapon did not, without more, permit the prosecution to introduce evidence of any .40 caliber weapon that appellant may have owned.
The remote theoretical possibility that some other .40 caliber weapon besides Young’s .40 caliber Taurus could have been responsible for the bullets found in Op-erle’s body makes evidence of the .40 caliber weapon found in appellant’s mother’s home marginally relevant. But the marginal relevance of this weapon — which the state never actually linked to the scene of the crime — is substantially outweighed by the danger of unfair prejudice and confusion of the issues. There is a danger that such evidence would show the bad character or propensity of the accused. See Agatheas, 77 So.3d at 1239. Furthermore, we do not see any relevance to the .45 caliber ammunition found at appellant’s mother’s home, as there was nothing that linked this ammunition to the crime.
This error is nevertheless subject to a harmless error analysis. “The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986).
At the outset of our harmless error analysis, we note that irrelevant collateral crimes evidence is presumed harmful. See Agatheas, 77 So.3d at 1240. Moreover, the state’s key witness, Operle, was under the influence of drugs and alcohol at the time of the shootings, had been shot and was unconscious for a few seconds, and was trying to play dead at the time he allegedly saw appellant fire the second shot at Jacobs. Furthermore, appellant denied ever shooting Jacobs or assisting the co-defendant. On this record, we cannot say that the error was harmless. We are thus compelled to reverse appellant’s conviction and remand for a new trial.

Reversed and Remanded.

CIKLIN and GERBER, JJ., concur.

. Without further comment, we conclude that the trial court properly denied appellant's motion for judgment of acquittal and did not abuse its discretion in denying his motions for mistrial.