CIKLIN, J.
Patrick Young was tried and convicted of a number of serious crimes including first-degree murder and armed robbery, stemming from a deadly early morning encounter at a residence in Broward County in 2007. Young raises multiple issues on appeal, none of which we find warrant reversal, but we write to discuss two of them.
Young and co-defendant Markinsey Me-tayer[1] were tried together for the same crimes. In Metayer’s appeal, we laid out most of the facts relevant to the instant case:
The tragic shooting incident occurred in a Broward County home in the early morning hours of July 22, 2007. Following the incident, [Metayer] and ... Young were charged by indictment with Murder in the First Degree of Adam Jacobs (Count I), Attempted Murder in the First Degree of Jason Operle (Count II), Attempted Murder in the First Degree of Gregory Hunt (Count III), Armed Robbery of Adam Jacobs (Count IV), and Armed Robbery of Jason Op-erle (Count V).
At trial, Operle testified that late in the evening on July 21, 2007, he and his best friend, Jacobs, went out and had a few drinks. By around 5:30 a.m. on July 22, 2007, they returned to the house in Coral Springs where Jacobs was staying. They drank more alcohol and smoked a cigar rolled with marijuana and cocaine. That morning, Jacobs received several calls on his cell phone from his friend, ... Young. Young told Jacobs that he was going to stop by the house. Operle was friendly with Young. Operle testified that both Young and Jacobs were drug dealers. When Young arrived at the house, [Metayer] was with him. Op-erle had never seen [Metayer] before. They all sat down to eat breakfast at a table in the living room area. Operle laid down on a couch in the living room after finishing his meal. After Young and Jacobs completed a marijuana transaction, Young asked Jacobs about his gun. Jacobs then asked Young if he “was carrying.” Young answered in the affirmative and took his gun out of his right back pocket. Meanwhile, Jacobs retrieved his gun from a black bag and *894 put it on the table. Young picked up Jacobs’s gun, comparing it to his gun. As Jacobs was seated at the table eating, Young stood up, put one of the guns back down, and then shot Jacobs in the chest. Jacobs fell to the ground. Op-erle described Jacobs as “gasping for air.” Operle did not hear Jacobs [1] say any words, but heard noise.
Operle screamed and tried to jump off the couch. Young walked over toward Operle and shot him in the front shoulder, causing Operle to fall off the side of the couch. Young pointed a gun in Op-erle’s face and pulled the trigger, but the gun jammed. Young told Operle to “get on the ground.” When Operle got on the ground, Young kicked him in the face. Young then shot Operle in the back, behind his right shoulder. Operle testified that he went into convulsions, had a seizure, and lost consciousness. Operle estimated that he was unconscious for about 15 seconds, but was not really sure.
Operle heard Young tell [Metayer] to finish Jacobs off. According to Operle’s testimony, [Metayer] got up, grabbed one of the guns, stood over Jacobs, and shot him in the face. Jacobs died at the scene. It was later determined that Jacobs was shot twice with his own .45 caliber pistol.
As Operle was playing dead, Young took Operle’s sneakers, wallet, and watch. Operle then heard Young and [Metayer] going through the rest of the house. Operle eventually heard more gunshots in the house.
Meanwhile, Gregory Hunt was sleeping in the back bedroom of the home. He was awakened by several loud hand claps. [Metayer] opened the bedroom door and stuck his face inside. After Hunt indicated that the room was occupied, [Metayer] shut the door. Shortly thereafter, Hunt heard a gunshot, the bedroom door flew open, and Young came into the bedroom with a gun. Young shot Hunt in the back of his shoulder. Young pulled the trigger again, but the gun jammed and the cartridge was ejected onto the mattress. Young demanded Hunt’s money, but Hunt did not have any. Young then shot Hunt again just above the hip. Hunt passed out and the next thing he remembered was hearing the front door close.
Young and [Metayer] walked past Op-erle as they went out the front door. Operle never saw Young or [Metayer] take any money or drugs. As soon as Operle heard the car leave, he called 911. Operle and Hunt were both taken to the hospital.
Between 7:00 a.m. and 8:00 a.m. on the morning of the shootings, Young and [Metayer] arrived at the Miami home of Young’s girlfriend. Young was carrying a black bag. Young’s girlfriend later saw that the bag contained drugs, money, and a gun. She did not see any blood on Young’s body or clothing. [Metayer] left the house about five minutes later. Young put the money and drugs in a safe in his girlfriend’s bedroom closet. The following day, Young was arrested and the police recovered guns, drugs, and money from Young’s girlfriend’s house.
[[Image here]]
One of the guns recovered from Young’s girlfriend’s house, a .40 caliber S & W Taurus Millennium model, was examined and test fired by Alan Greenspan, a firearms examiner. Mr. Greenspan explained that although a 10 millimeter cartridge is proper for a .40 caliber weapon, it is possible to use 9 millimeter ammunition. However, when 9 millimeter ammunition is used, “some *895 times it will extract and eject and sometimes it won’t.” Greenspan testified that the casings found on the couch and in the dining room at the crime scene were fired from the above-referenced .40 caliber Taurus Millennium model. However, there were two spent projectiles recovered from Operle’s body at the hospital; they were the types of bullets that most commonly would be loaded in a 9 millimeter casing. There were insufficient markings for Greenspan to determine whether the .40 caliber Taurus Millennium gun fired those bullets. Greenspan testified that it was possible those bullets could have been fired from any .40 caliber weapon.
Metayer v. State, 89 So.3d 1003, 1004-06 (Fla. 4th DCA 2012).
Additionally, the state offered into evidence photographs of an Uzi submachine gun and its accompanying 9 millimeter ammunition which were found in a safe belonging to Young’s girlfriend. The Uzi and its ammunition were the subject of a defense pre-trial motion in limine which the trial court denied.
Young was found guilty of all charges and was sentenced to five life terms. This appeal follows.
Young first argues that the trial court erred in permitting the admission of the photographs of the Uzi submachine gun and 9 millimeter ammunition found in his girlfriend’s safe. We review this decision for a clear abuse of discretion. See, e.g., Hall v. State, 107 So.3d 262, 273 (Fla.2012) (“Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion.” (citation and quotation marks omitted)). On appeal Young claims that the Uzi and its ammunition were not relevant to the charged crimes, and alternatively, any relevance was substantially outweighed by its unfairly prejudicial effect.
Under section 90.402, Florida Statutes (2007), all relevant evidence is admissible except as provided by law. “Relevant evidence is defined as evidence tending to prove or disprove a material fact....” McDuffie v. State, 970 So.2d 312, 326-27 (Fla.2007) (citations and quotation marks omitted).
For evidence of a firearm to be admissible as relevant in a criminal trial, the state must show a sufficient link between the weapon and the crime. See Agatheas v. State, 77 So.3d 1232 (Fla.2011). While there was no evidence that the Uzi was used in the triple shooting, two projectiles recovered from Operle’s body were the type of bullets that would most likely have been loaded in a 9 millimeter casing. The two weapons used were Jacobs’s .45 caliber handgun and Young’s .40 caliber handgun. Firearms expert Greenspan testified that 9 millimeter ammunition is not the proper ammunition for a .40 caliber gun; however, 9 millimeter ammunition could be used in it but would cause problems such as jamming. There was testimony at the trial that Young’s gun jammed twice during the shootings.
The state plausibly theorized that Young loaded 9 millimeter ammunition into his .40 caliber handgun which explained both the projectiles found in Operle’s body and why Young’s gun jammed twice. The Uzi and 9 millimeter ammunition were relevant to clarify why Young would have loaded his gun with marginally functional ammunition: because he had convenient and easy access to the 9 millimeter bullets.
While we believe that the Uzi and its ammunition were relevant, that does not end our analysis. Relevant evidence is inadmissible “if its probative value is substantially outweighed by the danger of unfair prejudice.” § 90.403, Fla. Stat. (2007). We are aware that the danger of unfair prejudice is particularly significant when *896 evidence of guns not used in the charged crimes is admitted. However, in the matter before us, the probative value of the Uzi and its ammunition explained an important facet of the case that defense counsel was sure to explore. The question before us is not whether the evidence is simply prejudicial but whether the probative value is substantially outweighed by the danger of unfair prejudice. Based on the facts of this case, we cannot say that it is.
 Further, even if we were to conclude that the Uzi and 9 millimeter ammunition were irrelevant, we would find the error to be harmless because “there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986) (citation omitted). While the harmless error test is not an “overwhelming evidence test,” id. at 1139, in order to discern the potential impact of the supposed error on the jury, it is important to scrutinize the context in which it occurred, i.e., the trial. See Armstrong v. State, 73 So.3d 155, 170-71 (Fla.2011) (“A harmless error analysis ‘requires an examination of the entire record.’” (quoting DiGuilio, 491 So.2d at 1135)).
At no point during the fourteen-day trial did the state emphasize the Uzi or its ammunition, both of which were admitted in photograph form only — together with approximately 200 additional photographs. In closing argument, the state briefly mentioned the Uzi but only to point out that it explained why 9 millimeter ammunition was used in the shooting and why Young’s gun jammed twice. The relative impact of the Uzi was minimal when considered in the overall context of the extensive trial.[2]
Young also argues that the trial court erred in permitting testimony that he was a drug dealer. In a previous hearing on defense counsel’s motion in limine, the trial court found this testimony to be relevant because it was inextricably intertwined with the charged crimes. We find no clear abuse of discretion in this conclusion.
“It is well-established that ‘[evidence of a collateral offense may be admissible on the ground that it is inextricably intertwined with the charged offense and therefore relevant to prove that offense.’ ” Ward v. State, 59 So.3d 1220, 1222 (Fla. 4th DCA 2011) (quoting Kates v. State, 41 So.3d 1044, 1045 (Fla. 1st DCA 2010)). “Evidence is ‘inextricably intertwined’ if it is necessary to (1) adequately describe the deed; (2) provide an intelligent account of the crime(s) charged; (3) establish the entire context out of which the charged crime(s) arose; or (4) adequately describe the events leading up to the charged crime(s).” Id. (citing Dorsett v. State, 944 So.2d 1207, 1213 (Fla. 3d DCA 2006)). However, we caution that just because a series of events precedes a criminal episode does not automatically make it inextricably intertwined and therefore relevant. See, e.g., Ward, 59 So.3d at 1223-24 (finding that extensive testimony and evidence about a shooting that preceded a police chase that resulted in the sole charge of fleeing or eluding a police officer was not inextricably intertwined).
The state’s account was that Young and Jacobs were both drug dealers and the *897 triple shooting was the product of a “drug deal gone bad.” The evidence that Young and Jacobs were drug dealers was necessary to fully explain the events that occurred prior to and after the melee in order to understand the shooting itself.
Operle testified that just before the shooting volley began, Young accepted a bag of marijuana from Jacobs in exchange for a $100 bill. Young also took a bag from the residence before leaving which contained drugs. Therefore, we conclude that it was not an abuse of discretion for the trial court to find that evidence of Young’s occupation as a drug dealer was inextricably intertwined with the charged crimes. We also find that the danger of unfair prejudice did not substantially outweigh the probative value of this evidence.
Therefore, we affirm Young’s convictions and sentences. As we find his other arguments on appeal to be without merit, we decline to address them further.

Affirmed.

STEVENSON and TAYLOR, JJ., concur.

. Last year, we reversed Metayer’s sole conviction for first-degree murder based on the admission of collateral firearms evidence that we found to be marginally relevant, unfairly prejudicial, and not harmless. See Metayer v. State, 89 So.3d 1003 (Fla. 4th DCA 2012).

. While we reversed co-defendant Metayer’s sole conviction in this case due to the improper admission of collateral firearms evidence, we must clarify that the firearms at issue in his case were entirely different from the firearms in the instant appeal. The firearms found in Metayer’s mother’s residence in Miami six months after the shooting had limited probative value at best and unfairly prejudiced his case. Metayer v. State, 89 So.3d 1003, 1006-08 (Fla. 4th DCA 2012). Therefore, we are not constrained by our holding in Metayer.